**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| LINDA JENESKI, | § | |
| And Class of Similarly | § | |
| Situated Individuals; | § | |
| | § | |
| Plaintiffs; | § | |
| | § | NO. 05-40019-FDS |
| -vs.- | § | |
| | § | |
| CITY OF WORCESTER, MASS., *ET AL.*; | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S OPPOSITION (WITH AUTHORITY) TO CITY DEFENDANTS'**

**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**WITH MOTION FOR OPPORTNITY TIMELY TO REPLEAD**

COMES NOW LINDA JENESKI and replies in opposition to the *Motion to Dismiss Plaintiff's First Amended Complaint* (Doc. #39) and supporting *Memorandum* (Doc. #40) of the CITY OF WORCESTER, STEPHEN H. WILLAND, DONALD H. ANDERSON, CARLENE BULL, and DAVID MOORE. "City Defendants" move to dismiss on several grounds under FED. R. CIV. P. 12(b)(6) and 12(b)(1) by reciting in their *Memorandum* the standard of review and then each individual ground in paragraphs "III. Argument, "A" through "I." The sequence of plaintiff's response differs somewhat from the defendant's order of argument because, ". . . the district court should resolve an FRCP 12(b)(1) motion before the defendant's other challenges because the court must find that it has subject matter jurisdiction before it can determine any other issues." *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 149-50 (1st Cir.2002).

I. SUBJECT MATTER JURISDICTION

A.    Introduction

Much of what the City Defendants advance to defeat this Court's subject matter jurisdiction turns on City Defendants characterization of the plaintiff's allegations of deprivation of "due process and equal protection" as principally due process.  Plaintiff recites them together because of their historical "one pervading purpose," with that relationship explained by the Supreme Court:

> The Equal Protection Clause, however, was "[virtually] strangled in infancy by post-civil-war judicial reactionism." [*citing* at fn. 29 Tussman & tenBroek, *The Equal Protection of the Laws*, 37 CALIF. L. REV. 341, 381 (1949)].  It was relegated to decades of relative desuetude while the Due Process Clause of the Fourteenth Amendment, after a short germinal period, flourished as a cornerstone in the Court's defense of property and liberty of contract.  *See, e. g., Mugler v. Kansas*, 123 U.S. 623, 661 (1887); *Allgeyer v. Louisiana*, 165 U.S. 578 (1897); *Lochner v. New York*, 198 U.S. 45 (1905).  In that cause, the Fourteenth Amendment's "one pervading purpose" was displaced.  *See, e. g., Plessy v. Ferguson*, 163 U.S. 537 (1896).  It was only as the era of substantive due process came to a close,  *see, e. g., Nebbia v. New York*, 291 U.S. 502 (1934);  *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), that the Equal Protection Clause began to attain a genuine measure of vitality,  *see, e. g., United States v. Carolene Products*, 304 U.S. 144 (1938);  *Skinner v. Oklahoma ex rel. Williamson, supra.*

*Regents of the University of California v. Bakke*, 438 U.S. 265, 292 (1978).

Significantly, while the two are often pleaded together, as is the case here, it is clear that an equal protection claim is independently cognizable.  *See, e.g., Baker v. Carr*, 369 U.S. 186 (1962)(guaranty clause, due process and equal protection all pleaded, case decided solely on equal protection grounds).

Turning, then, to the live pleadings, plaintiff sets forth a clear equal protection claim:

> The putative CLASS of similarly situated individuals are those . . . who have been *unequally deprived* of the rights and protections afforded to all citizens of the Commonwealth . . . under its Civil Service Laws . . . .  More definitely the Class consists of those individuals [including Linda Jeneski] against whom adverse employment decisions were made without the affected employee having an opportunity, *equal to other citizens of Massachusetts*, to challenge those decisions under the civil service laws."

FIRST AM. CPLT. ¶ 3 (emphasis added).

Thus, the complaint clearly informs the defendants that this is chiefly an equal protection clause case with attendant due process clause implications, with both clauses clearly intertwined in the case law.  Two examples of the intertwining of these remedies are as follows:

"When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 [of the Fourteenth Amendment] authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the *Equal Protection Clause*." *Tennessee v. Lane*, 541 U.S. 509, (2004)(emphasis added) *citing Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256 (1979).  "Section 5 of the Fourteenth Amendment provides that Congress 'shall have power to enforce, by appropriate legislation, the provisions' of that Amendment -- including, of course, the Amendment's Equal Protection *and* Due Process Clauses." *Tennessee v. Lane, supra* (emphasis added).

Thus, what plaintiff clearly pleads is a practice of City that is ". . . discriminatory in effect, if not in practice [that violates] the basic objectives of the Equal Protection Clause."

With the *First Amended Complaint's* clear assertion of violations of the Equal Protection Clause in mind, Plaintiff addresses each of the City Defendants' subject matter jurisdictional challenges, *seriatim.*

B.     Failure to Exhaust Administrative Remedies

Defendants' first subject matter jurisdictional challenge is failure to exhaust administrative remedies, MEMORANDUM at "B," pp. 8-10.  In response and simply put, plaintiff asserts that City of Worcester has unlawfully applied the exemption provision of MASS. GEN. L. ch. 33, § 48 which itself indicates what Ms. Jeneski and class have been denied, and that from which they have also been exempted, *i.e*, ". . . from the civil service law *and rules* . . . ." *Id.* (emphasis added).  Yet, City complains, disingenuously, that plaintiff and class must follow the very rules from which the

plaintiff was unlawfully exempted by the City Manager's 1972 Ordinance, found at Exhibit "A" to

the live pleadings.  As a threshold matter, this inconsistent assertion by the City Defendants has a

significant legal effect: judicial estoppel.

> Although we have not had occasion to discuss the doctrine elaborately, other courts
> have uniformly recognized that its purpose is "to protect the integrity of the judicial
> process," *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982), by "pro-
> hibiting parties from deliberately changing positions according to the exigencies of
> the moment," *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993).  *See In re
> Cassidy*, 892 F. 2d 637, 641 (7th Cir.1990)("Judicial estoppel is a doctrine intended
> to prevent the perversion of the judicial process.");  *Allen v. Zurich Ins. Co.*, 667 F.
> 2d 1162, 1166 (4th Cir.1982)(judicial estoppel "protect[s] the essential integrity of
> the judicial process.");  *Scarano v. Central R. Co.*, 203 F. 2d 510, 513 (3rd Cir.1953)
> (judicial estoppel prevents parties from "playing `fast and loose with the courts'"
> (*quoting Stretch v. Watson*, 6 N. J. Super. 456, 469, 69 A. 2d 596, 603 (1949)).
> Because the rule is intended to prevent "improper use of judicial machinery,"
> *Konstantinidis v. Chen*, 626 F. 2d 933, 938 (D.C. Cir.1980), judicial estoppel "is an
> equitable doctrine invoked by a court at its discretion." *Russell v. Rolfs*, 893 F. 2d
> 1033, 1037 (9th Cir.1990)(citation omitted).

*State of New Hampshire v. State of Maine*, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

*Accord  Alternative System Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23 (1st Cir.2004)(doctrine

invoked to prevent advancement of inconsistent positions).

Therefore, the inconsistent position advanced here, even without more, is sufficient to invoke

the doctrine against the assertion of failure to exhaust.

There *is* more, however.

> Ordinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not
> exhaust administrative remedies before filing suit in court.  *See Patsy v. Board of
> Regents of Fla.*, 457 U. S. 496, 516 (1982).  Prisoner suits alleging constitutional
> deprivations while incarcerated once fell within this general rule.  *See Wilwording
> v. Swenson*, 404 U. S. 249, 251 (1971)(*per curiam*).  In 1980, however, Congress
> introduced an exhaustion prescription for suits initiated by state prisoners. *See* CIVIL
> RIGHTS OF INSTITUTIONALIZED PERSONS ACT, 94 Stat. 352, as amended, 42 U. S. C.
> § 1997e (1994 ed.).

*Porter v. Nussle*, 122 S.Ct. 983, 534 U.S. 516, 152 L.Ed.2d 12 (2002).

*Patsy*, cited in *Porter*, is alive and well in the First Circuit. As recently as February 6, 2006, the Court considered "failure to exhaust administrative remedies" in a § 1983 case in which municipal employees (as compared to state prisoners, *supra*) sued for First, Fifth, and Fourteenth Amendment violations – a case on all fours.

> Defendants argue that because the career plaintiffs declined to take their complaint to the Board of Appeals of the Personnel Administration System (known as JASAP) within thirty days, the municipal personnel decision became unappealable. This is clearly incorrect: state employees asserting claims such as these are not required to exhaust administrative remedies before bringing a § 1983 action in federal court. *Baez-Cruz v. Municipality of Comerio*, 140 F.3d 24, 30 (1st Cir.1998)(*citing Patsy v. Board of Regents*, 457 U.S. 496, 515 (1982)).

*Colon v. Roman-Abreu*, ____ F.3d ____, No. 04-1221 (1st Cir. February 6, 2006).

Defendants "failure to exhaust administrative remedies" argument is unavailing and should be rejected by this Court.

C.      Counts I and II: Failure to Allege Cognizable Claim

With respect to cognizability, City Defendants assert that "[w]hile Counts I and II . . . *purport* to allege violations of Plaintiff's federal constitutional rights, in fact they merely recast an alleged violation of state civil service law as a violation of a Constitutional right." MEM. at "C," p. 10 (emphasis added). Although characterized as "failure to state a claim," (*id.*, p. 11), cognizability is jurisdictional and accordingly, plaintiff treats it under 12(b)(1).

Turning, again, to the live pleadings, the following is what the plaintiff actually (not purportedly) alleges in the form of a clear equal protection claim:

> The putative CLASS of similarly situated individuals are those . . . who have been *unequally deprived* of the rights and protections afforded to all citizens of the Commonwealth . . . under its Civil Service Laws . . . . More definitely the Class consists of those individuals [including Linda Jeneski] against whom adverse employment decisions were made without the affected employee having an opportunity, *equal to other citizens of Massachusetts*, to challenge those decisions under the civil service laws."

FIRST AM. CPLT. ¶ 3 (emphasis added).

In response, plaintiff asserts that "[i]n a facial attack, the district court will accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct 1683, 1686 (1974). Therefore, plaintiff has facially stated an equal protection claim and dismissal on this ground should be denied.

In the alternative, and in the event that the Court determines that this is a factual challenge (as compared to a facial challenge), "[w]hen a party challenges subject matter jurisdiction, the court is given the authority to resolve factual disputes, along with the discretion to devise a method for making a determination with regard to the jurisdictional issue." *Land v. Dollar*, 330 U.S. 731, 735, 91 L. Ed. 1209, 67 S. Ct. 1009 and n. 4, 67 S. Ct. 1009, 1011 and n. 4, 91 L. Ed. 1209 (1947). "Then, in resolving the question of subject matter jurisdiction, the district court can refer to evidence outside the pleadings. . . . "Unlike with a motion for failure to state a claim under FED. R. CIV. P. 12(b)(6), the attachment of exhibits to an FED. R. CIV. P. 12(b)(1) motion does not convert it to an FED. R. CIV. P. 56 motion." *Gonzalez v. U.S.*, 284 F.3d 281, 288 (1st Cir.2002). Assuming then, *arguendo*, that City Defendants' challenge is factual rather than facial, fact issues arise as to Plaintiff being "*unequally deprived* of the rights and protections afforded to all citizens of the Commonwealth . . . under its Civil Service Laws." *Supra*. In that regard, Plaintiff submits her *Affidavit of Linda Jeneski*, attached hereto and fully incorporated herein by reference. Of particular concern here is the fact that the Plaintiff's unawareness of the equal protection deprivation itself arises from an illegal act of the Willand defendant who forbade employee contact with city management, in direct violation of the Commonwealth's law which provides that:

> No person shall deny or interfere with the right of civil service employees employed by any city or town to petition, individually or collectively, the city or town government or any member thereof, to furnish information to the mayor, city or town

> manager, city council, or board of aldermen or selectmen or to appear before any
> committee of such council or boards, or deny or interfere with the right of any civil
> service employees to petition, individually or collectively, the general court or any
> member thereof, to furnish information to either branch of the general court, or to
> appear before any of its committees. This section shall not be construed to authorize
> an employee who is not on leave to be absent from his employment without
> permission during regular working hours.

*Id.*, ch. 31 § 75.

In effect, should the Court determine that a factual challenge to jurisdiction is involved here, the Court may order an evidentiary hearing on the matter, including the taking of evidence that would preclude relief to City Defendants under the principles of judicial estoppel, *supra.*

### D.    Counts I and II: Failure to Identify Constitutional Deprivation

City Defendants challenge under "failure to identify a constitutional right of which she was deprived," MEMORANDUM at "D," pp. 11-18, is set forth in three subparts: (1) no property right entitlement to procedural due process; (2) no property right entitlement to substantive due process; and (3) no equal protection claim because of failure to allege malice or bad faith.

Subparts (1) and (2) deal with procedural and substantive due process issues which flow from the equal protection violation and thus, will be addressed later. Instead, Plaintiff now moves directly to the crux of the equal protection case, Subpart (3), in which City Defendants finally recognize, *i.e.*, that "'The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government.'" MEMORANDUM at D.3, p. 16, *citing Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir.2004).[1]

> The Tapalian claim rests upon the latter prong, *viz.*, an allegation of malice or bad
> faith. Normally, such a plaintiff must establish more than that the government
> official's actions were simply arbitrary or erroneous; instead, the plaintiff must

---

[1] Needless to say, City Defendants are now estopped from asserting a position that Plaintiff's *First Amended Complaint* has failed to apprise them that this case is one that involves an equal protection claim, *i.e.*, that she and her class have not received "substantially similar treatment from their government."

establish that the defendant's actions constituted a "gross abuse of power." *Baker v. Coxe*, 230 F.3d 470, 474 (1st Cir.2000); see *Rubinovitz v. Rogato*, 60 F.3d 906, 912 (1st Cir.1995) (noting that "gross abuse of power" may obtain where official harbors personal hostility toward plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm"); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 566 (2000)(Breyer, J., concurring)(*noting that some otherwise "ordinary violations of city or state law" may become actionable under the equal protection clause provided the plaintiff proves "extra factor[s]," such as "vindictive action," "illegitimate animus" or "ill will"*); *Esmail v. Macrane*, 53 F.3d 176, 179, 180 (7th Cir.1995)(finding viable equal protection claim based upon (i) mayor's "orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and (ii) "spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any legitimate state objective").

*Id.* (emphasis added).

Before pointing out what Justice Breyer calls the "extra factors" needed to make actionable an "ordinary violation of . . . state law," a brief overview of additional pertinent parts of the Massachusetts civil service system is needed.

The law casts a broad protective net over all state and city employees. "All offices and positions in the official service of the commonwealth shall be subject to the civil service law and rules unless expressly exempted by this chapter or other law. . . . Offices and positions in the service of cities and towns shall be subject to the civil service law and rules as provided by sections fifty-one, fifty-two, and fifty-three." Mass. Gen. L. ch. 31 § 48. There are two ways out-of-the-system, so to speak: exemption and civil service alternative. The alleged false exemption at issue here is that of the "City Manager" which provides, in pertinent part: "The following shall be exempt from the civil service law and rules, unless expressly made subject thereto by statute: City and town managers and assistant city or town managers, and administrative assistants, secretaries, stenographers, clerks, telephone operators and messengers connected with the offices of city councils, town councils, mayors, city managers, town managers and selectmen. . . ." (*See* fn. 2, *infra*). The only other way out-of-the-system is through voter adoption of the municipal personnel ordinance that

requires, in pertinent part, that:

> Any city or town subject to civil service law as provided in chapter thirty-one, or by special law, may exercise the option of establishing a decentralized personnel system and may become exempt from the provisions of chapter thirty-one or special law, provided that such city or town complies with the conditions provided hereinafter.

> Local personnel systems developed pursuant to this chapter shall be consistent with accepted merit principles and each municipality shall include in its personnel ordinance or by-law a statement of said principles. Accepted merit principles shall include, but shall not be limited to:

> A.    the recruiting, selecting and advancing employees on the basis of their relative ability, knowledge and skills including open consideration of qualified applicants for initial appointment;

> B.    providing just compensation for all employees;

> C.    providing training and development for employees, as needed, to assure the advancement and high quality performance of such employees;

> D.    retaining employees on the basis of adequacy of their performance, correcting inadequate performance, and separating employees whose inadequate performance cannot be corrected;

> E.    assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens, and;

> F.    assuring that all employees are protected against coercion for political purposes, and *are protected from arbitrary and capricious actions.*

MASS. GEN. L. ch. 31A § 1 (emphasis added). Significantly, the statement of "accepted merit principles" established in the alternative municipal system, ch. 31A, *supra*, mirrors an identical provision in the standard civil service law at ch. 31 § 1 under the title of "basic merit principles." This evidences a clear legislative intent to impose objectivity and rationality on the personnel practices within the Commonwealth, including a prohibition against "arbitrary and capricious

actions." The only way to avoid that prohibition is to unlawfully invoke the ch. 31 § 48 exemption, a provision clearly designed to exempt political, at-will, confidential employees. Finally,

> Any person who wilfully or negligently violates or conspires to violate any of the provisions of the civil service law and rules, or who knowingly makes an appointment or employs any person in violation of such law and rules, or who refuses or neglects to comply with any provision of such civil service law and rules, shall be punished by a fine of not more than one thousand dollars or imprisonment for not more than one year, or both, unless a different penalty is specifically provided in this chapter.

*Id.*, ch. 31 § 71.

Applying, then, Justice Breyer's "extra factor[s]," such as "vindictive action," "illegitimate animus" or "ill will," coupled with the statutory prohibition against "arbitrary and capricious actions," and adding-in the intent to deceive evidenced in the unlawful invocation of ch. 31 § 48, *supra*, we turn again to pertinent parts of the plaintiff's allegations in the live pleadings:

> 14.     Plaintiff is a Master's Degreed professional. In 1988 plaintiff became the supervisor of the Career Assessment Unit stationed at the Welfare Offices of the so-called City Manager's Office of Employment and Training (CMOET).[2] Grant implementation was a major part of plaintiff's responsibilities. Plaintiff thus became involved in so-called "authorized spend-downs," *i.e.*, alternative ways to use state and federal funds to serve clients in a manner prescribed by law.

> 15.     In 1993 or 1994, plaintiff inquired of defendant BULL about excess welfare-to-work earnings and why they were *not* being used to extend client services in the manner intended by law.[3] Plaintiff was told by defendant WILLAND it was not part of her job. Upon information and belief, the BULL defendant reports to the

---

[2]     The CMOET anagram has significance for the illegal conduct that gives rise to this lawsuit. By adding the prefix "City Manager" to city departments, the defendant City of Worcester has been able, since 1972, to unlawfully circumvent the State's civil service laws, MASS. GEN. L. ch 31 *et seq.*, by "historically considering" those offices "exempt." In 2004, the City has admitted that it needs state legislative approval to exempt these departments. This conduct is criminalized in the civil service laws. *See* MASS. GEN. L. ch. 31 § 74. This is the criminal conduct at the state level that enables the federal due process and equal protection violations.

[3]      What the funds were actually being used for would only appear later, *infra*. Nevertheless, in hindsight, it appears that at this point she was beginning to get some perception of misapplication of funds in violation, later learned, of 18 U.S.C. § 666.

ANDERSON defendant on the organizational chart of "Workforce Central," but *de facto*, reports to the WILLAND defendant.

16.    From 1994 until her abrupt discharge in 2002, Plaintiff would question the BULL defendant about the propriety of charging time on time-sheets to grants other than those on which she actually worked. Plaintiff became concerned enough about this practice that she would not sign time sheets until she received confirmation, preferably in writing, from the department director or the fiscal coordinator, the ANDERSON and BULL defendants, respectively.

17.    Between August 1998 and July 2000, the federal funding program known by plaintiff as the Job Training Partnership Act (JTPA) was superseded by the new Workforce Investment Act (WIA). Thus, among the office staff, there was much discussion about the differences between "Jitpa" "Weeah," e.g., the "firewall of integrity" and "separation" required by WIA between the Regional Employment Board (REB) – [under WIA the Workforce Investment Board (WIB)] and her office (CMOET).[4]

18.    Between July 2000 and September 2002, plaintiff suspected that earned but unexpended welfare funds, in which her unit was involved, were being used to support the Regional Employment Board (at that point, still not renamed as the Workforce Investment Board "WIB" as required by WIA) but she was unaware, until advised by counsel, of the felony implications of this conduct on the part of the WILLAND defendant.

19.    From 2001 until her abrupt and wrongful termination in September 2002, plaintiff worked as a trainer, state-wide, and earned additional funds for CMOET which she suspected were being used by the Regional Employment Board Director, the WILLAND defendant.[5]

20.    Regarding the above mentioned "additional funds," Plaintiff asked the ANDERSON defendant how the time should be entered in the time sheet. ANDERSON forwarded the question to the BULL defendant who told plaintiff not to enter it on the time-sheet, thus providing the WILLAND, ANDERSON, and BULL defendants with another surplus source of funds.

21.    Prior to the plaintiff's abrupt "layoff" in September 2002, she and other staff members had been informed by the WILLAND defendant of the need for early retirements. Some staff members offered hourly reductions to save co-worker's jobs. However, plaintiff had the temerity to challenge the WILLAND defendant's assertions of insufficient funds in light of a new $800,000.00 grant. The WILLAND defendant demurred and plaintiff was discharged in September 2002. A co-worker,

---

[4] *See* 29 U.S.C. § 2832(f)(1)(A).

Paul Quinn was also discharged, but he was later re-hired. The lack of civil service protection was common knowledge among the employees based on the Executive Order.
. . . .

    25.    The MCAD action was not without benefit to the plaintiff, however. In the course of discovery in that case, plaintiff timely learned of the slush-fund of welfare monies used to support the WILLAND defendant's extravagant executive life-style as evidenced in Exhibit "B," attached hereto and incorporated herein by reference as if set for at length.

---

5  At this point plaintiff perceives that the conduct of the WILLAND defendant is merely inappropriate in that although extravagant, the expenditure of funds does not appear to her to be a conversion for personal use. To the contrary, *see* 18 U.S.C. § 666 and *United States v. Westmoreland,* 841 F.2d 572, 576 (5th Cir. 1988), *cert. denied,* 488 U.S. 820 (1988)(Congress desired to protect the integrity of federal funds by assuring the integrity of the organization or agencies that receive them); *see also United States v. Rooney*, 986 F.2d 31, 34 (2nd Cir. 1993). For the use of "misapplication," see Jury Instruction 6.18.666A which, when applied here, means that to "misapply" means to use the funds or property of City of Worcester knowing that such use is unauthorized, or unjustifiable, or unlawful. Misapplication includes the wrongful taking or use of the money or property of City of Worcester by him as its Agent, for his own benefit, the use or benefit of some other person, or an unauthorized purpose, even if such use benefitted the City of Worcester.

PL. FIRST AM. CPLT. at pp. 4-8 (footnotes reproduced as in the complaint).

In effect then, all the court needs to ask is whether, under the circumstances, Ms. Jeneski's discharge, which would have been prevented *but for* the equal protection violation (which opened the door wide to rampant arbitrary and capricious actions), also constituted vindictive action, illegitimate animus, or ill will. Plaintiff contends that all three are involved here, particularly in light of the criminal conduct she alleges both in violation of the civil service laws (MASS. GEN. L. ch. 31 §§ 74, 75) which opened the door to rampant arbitrary and capricious behavior, and further, federal criminal violations 18 U.S.C. § 666 (*see* CPLT. at fn. 3 and 5, *supra*).[2] Thus, the Court clearly has jurisdiction over Plaintiff's equal protection claim which provides it an adequate and independent jurisdictional foundation.

---

    [2] It must also be kept in mind that Exhibit "B" to the pleadings (not reproduced here) constitutes an allegation by the Plaintiff that the welfare-to-work "slush fund" she has uncovered amounts to almost one million dollars.

Plaintiff next turns to the consequential procedural and substantive due process issues, MEMORANDUM at "D," subparts (1) and (2), *seriatim.*

In Par. "D," subpart (1), pp. 12-14, City Defendants assert that Plaintiff was an at-will employee and thus, not entitled to due process.  In fact, Plaintiff was, *de facto,* an at-will employee because of the City Defendants unlawful and criminal conduct.  Plaintiff thus asserts that City Defendants should be equitably estopped from taking this position on well recognized principles that require no elaboration here.

In Part "D," subpart (1), pp. 14-16, City Defendants contend that Plaintiff (a) had no property interest nor (b) was the City's conduct such that it shocks the conscience.  To the contrary, *but for* the City Defendants' unlawful and criminal conduct which "shocks the conscience," Plaintiff *de jure* had a legitimate property interest and thus, this argument is unavailing.

## II.  SUPPLEMENTAL JURISDICTION

Plaintiff next addresses City Defendants' arguments against supplemental jurisdiction.  MEMORANDUM at "F," pp. 19-20.  Plaintiff agrees with movants that "[i]n the event that the federal claims survive the Defendant's motion to dismiss, this Court could retain jurisdiction over the state law claims through the discretionary exercise of supplemental jurisdiction." *Id., citing Vera-Lozano v. Int'l Broad (sic)*, 50 F.3d 67, 70 (1st Cir.1995).  Plaintiff thus addresses the City Defendants' arguments against the supplemental claims for which City Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

## III.  FAILURE TO STATE A CLAIM

### A.    Introduction

"A motion to dismiss under FED. R. CIV. P. 12(b)(6) is not appropriate unless the plaintiff's pleadings on their face show, beyond a doubt, that the plaintiff cannot prove any set of facts that

would entitle it to relief." *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1ˢᵗ Cir.2002). *See generally* 5B Wright & Miller, Federal Practice and Procedure: Civil§ 1356 (discussing purpose of 12(b)(6) motion and distinguishing it from other Rule 12 motions). "It is axiomatic that a motion to dismiss an action for failure to state a claim upon which relief can be granted admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." *Ward v. Hudnell*, 366 F.2d 247 (5th Cir.1966) *citing* 1A Barron & Holtzoff, Federal Practice and Procedure § 350 (1960 Rules ed., Wright revision). "Motions to dismiss for failure to state a claim are viewed with disfavor and seldom granted." Wright & Miller, § 1357 at 598 (1969).

City Defendants assert a number of 12(b)(6) objections to which Plaintiff applies this law to the *First Amended Complaint*.

B.     Limitations

City Defendants assert limitations at Memorandum, Par. III. A, the crux of which is either (a) the discovery rule or (b) fraudulent concealment. The facts relating to each are the same and are recited in the pleadings as follows:

With respect to the circumstances surrounding her discovery of the unlawful 1972 memorandum, the complaint makes the following allegations:

21.     . . . . *The lack of civil service protection was common knowledge among the employees based on the Executive Order.*

22.     After her discharge, plaintiff retained the HENNIGAN defendant and his firm to represent her. She was advised by HENNIGAN To file a Title VII age and sex discrimination claim. HENNIGAN did not disclose that he was the author of or in any way involved with the development of the City's 1996 Plan of Reorganization which explicitly stated that the department in which plaintiff worked was to be called "Executive Office of Employment and Training," [quotation marks original], rather than *"City Manager's Office of Employment and Training 'CMOET,'" as it was so named at all times relevant herein.* Thus, from 1996 onward, if not before, HENNIGAN was aware of the 1972 unlawful civil service exemption that created a due process and equal protection violation by falsely prefacing "City Manager"

departmental titles to unlawfully exempt employees like her from civil service protections by improperly invoking MASS. GEN. L. ch. 31 § 48. *Indeed, Ms. Jeneski had told Hennigan that her Franklin Hampshire Service Delivery Area counter-part, Sara Wing, had mentioned to her the applicability of civil service redress. In addition, Attorney Elaine Baltas, acting as a consultant to Ms. Jeneski, provided the HENNIGAN firm with a copy of the above cited civil service laws.*
. . .

26.    One "piece-of the-puzzle" that precipitates this action is the new City Manager's *2004 Plan of Reorganization in which it is admitted that city departments that have "historically been considered exempt from civil service" now, indeed, require approval by the state legislature.* The 2004 Plan also continues to refer to the defunct Job Training and Partnership Act in an apparent reference to the ongoing violations of 28 U.S.C. 2832(f)(1)(A). (Fn. 3: Thus, from 1972 until present, an entire class of persons has been deprived of due process and equal protection of the civil service laws and that denial has been the subject of repeated and well documented admissions by the defendant City which freezes the statutes of limitations for the class over the 32 year period.).

27.    The other "piece-of-the puzzle" presented at the MCAD probable cause hearing [2004] in which, *for the first time*, an attorney representing City announced representation for the legislatively correct "Executive Office of Employment and Training" ["City Manager" prefix needed to form CMOET noticeably lacking].

PL. FIRST AM. CPLT. at pp. 6-9 (emphasis and bracketed comment added).

Concerning accrual, defendants insist that accrual is a matter of federal law, citing a line of cases which do not involve the kind of "active fraud or fraudulent concealment" that is involved here. Indeed, *Rodriguez-Narvaez*, on which defendants rely was a case in which accrual occurred on ". . . the date she was notified of her transfer . . . ." *Id.*, 895 F.2d at n.5. Thus, the "general rule" it articulates consists of cases which themselves arise from a conglomeration of state law. Neither is Defendants' reference to MASS. GEN. L. §§ 2A and 5B instructive since neither statute defines what is meant by accrual. What *is* instructive and what City Defendants fail to bring to the Court's attention is that Massachusetts has a specific statute that applies to limitations in cases of fraudulent concealment, which provides that:

If a person liable to a personal action fraudulently conceals the cause of such action

from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

MASS. GEN. L. ch. 260 § 12, "Fraudulent concealment; commencement of limitations." This statute is critical here since the First Circuit holds that "[s]ection 1983 creates a private right of action for violations of federally protected rights. Because it has no statute of limitations provision, § 1983 claims 'borrow[] the appropriate state law governing limitations unless contrary to federal law.'" *Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir.2003)(*citing Wilson v. Garcia*, 471 U.S. 261 (1984)).

Plaintiff thus turns to controlling Massachusetts case law construing ch. 260 § 12, in which the relationship between "active fraud" and "fiduciary duty" is crucial.

> Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is *equivalent to fraudulent concealment for purposes of applying § 12. See Puritan Medical Ctr., Inc. v. Cashman*, 413 Mass. 167, 175-176, 596 N.E.2d 1004 (1992), and cases cited (*fraudulent concealment under § 12 includes both affirmative acts done with intent to deceive, and breach of a fiduciary duty of full disclosure*); *Stetson v. French*, 321 Mass. 195, 199, 72 N.E.2d 410 (1947) ("mere failure to reveal may be fraudulent where there is a duty to reveal"); *Burns v. Massachusetts Inst. of Technology*, 394 F.2d 416, 419 (1st Cir.1968) (even in the absence of express trust, where fiduciary relationship arises from one party's repose of trust and confidence in another, *breach of resulting duty of disclosure is* <u>*substitute*</u> *for active fraud normally required to constitute fraudulent concealment under § 12*). <u>*An actual knowledge standard applies*</u> *to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G. L. c. 260, § 12.* Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary. *Puritan Medical Ctr., Inc., supra* at 176-177. *The plaintiff is not required to have made an independent investigation. Stetson v. French, supra* at 199. *See Sanguinetti v. Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 237-238, 361 N.E.2d 954 (1977) (claim not barred where attorney fraudulently concealed through failure fully to disclose, and client lacked actual knowledge of facts).

*Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159 (Mass. 1997)(emphasis added, footnotes omitted).

Applying this law to the facts, plaintiff has clearly pleaded actual fraud on the part of the

defendant City rather than breach of fiduciary duty.  Significantly, *Demoulis* construes ch. 260 § 12 to mean that active fraud is the statutory requisite and fiduciary duty the "substitute" or "equivalent to it for purposes of applying § 12."  Consequently, it follows that the standard applied to Plaintiff under § 12 is "actual knowledge" rather than any duty of due diligence as defendants assert.

In the alternative, City Defendants fail to come to terms with the clearly alleged systemic nature of the equal protection claim involved here.

> There are two kinds of continuing violations:  serial violations and systemic violations.  *See Mack,* 871 F.2d at 183 (explicating taxonomy and describing categorical differences). . . .[A] systemic violation need not involve an identifiable, discrete act of discrimination transpiring within the limitation period.  *See Mack*, 871 F.2d at 183.  A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint.  *See id.*; *see also Green*, 883 F.2d at 1480; *Johnson v. General Elec.*, 840 F.2d 132, 136-37 & n. 5 (1st Cir.1988); *Velazquez v. Chardon*, 736 F.2d 831, 833 (1st Cir.1984).

*Jensen v. Frank*, 912 F.2d 517 (1st Cir.1990); *cited in Centro Medico Del Turabo, Inc. v. Melecio*, 406 F.3d 1 (1st Cir.2005)(applies continuing violation doctrine in a §1983 equal protection case).

Applying this law, the Plaintiff's complaint clearly sets forth a systemic violation:

> The CMOET anagram has significance for the illegal conduct that gives rise to this lawsuit.  By adding the prefix "City Manager" to city departments, the defendant City of Worcester has been able, since 1972, to unlawfully circumvent the State's civil service laws, Mass. Gen. L. ch 31 *et seq.*, by "historically considering" those offices "exempt."  In 2004, the City has admitted that it needs state legislative approval to exempt these departments.  This conduct is criminalized in the civil service laws.  *See* Mass. Gen. L. ch. 31 § 74.  This is the criminal conduct at the state level that enables the federal due process and equal protection violations.

Pl. First Am. Cplt., Par. 14, n.2, p. 4.

Finally with regard to limitations, it is preposterous for City to assert under limitations that she ". . . enjoy[ed] the privileges of a non-civil service position for her 14 years of employment . . . ." [Mem. at 5], yet argue elsewhere that ". . . it is well settled law" that she has no constitutional

rights to due process because she is a "non civil-service, at-will" employee. [MEM. at 12]. This is the kind of "playing 'fast and loose' with the courts" which drew the disapproval of the United States Supreme Court in *State of New Hampshire, supra.*

Dismissal on limitations grounds, therefore, should be denied on statutory grounds, the continuing violation doctrine, or equitable grounds, any one of which suffices.

C.    Failure to Allege Conspiracy With Specificity

City Defendants assert "failure to allege sufficient facts" at MEMORANDUM, Par. III.E, the crux of which is that "plaintiff has failed to plead specific facts . . . ." *Id.* at p. 19, *citing Gross v. Bohn*, 782 F.Supp 173, 181 ("citations omitted" in original). *Gross v. Bohn* teaches that "[t]o state a claim under § 1985, [a] plaintiff must allege: (1) a conspiracy to violate his constitutional rights; and (2) some racial or other class-based discriminatory animus behind the conspirators' actions." *Id. citing Stanley v. City of New York*, 587 F.Supp. at 396 (citations omitted). This, plaintiff has accomplished. "Moreover, the complaint must state with specificity the facts demonstrating the existence and scope of the alleged conspiracy." *Id. citing Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977); *Carter v. Rollins Cablevision of Mass., Inc.*, 618 F. Supp. 425, 426 (D. Mass. 1985). This, plaintiff has arguably accomplished; yet even more specific allegations can be made. "Generally, a court will not dismiss [under 12(b)(6)] without leave to amend on the first challenge to plaintiff's complaint." *Curley v. Perry*, 246. F.3d 1278, 1281-82 (10th Cir.2001).

D.    Wrongful Discharge

At MEM., Part III.G, pp. 20-22, City Defendants first assert that this count should be dismissed as to defendants Willand, Anderson, and Bull because they are not her employers. Plaintiff agrees that without more, this assertion is correct. Nevertheless, since discovery has not been

initiated beyond the disclosure stage, and since these defendants are implicated in the alleged million dollar welfare-to-work slush fund which, under federal law, is maintained in the City's accounts (*see* 29 U.S.C. § 2832(d)(3)(B)(i)(II)), discovery may reveal issues of "common enterprise" in addition to the conspiracy allegations, *infra.* Thus, dismissal against the individual defendants is premature.

With respect to the City of Worcester itself, its arguments that Ms. Jeneski was an at-will employee are unavailing, as discussed above. Even assuming, *arguendo*, that she was an at-will employee, considerations of public policy violations provide an exception to the rule. In that regard, the court is directed to the public policy arguments, *supra*, particularly those surrounding the Commonwealth's criminalization of civil service violations (MASS. GEN L. ch. 31 § 74), and the federal criminalization of misapplication of funds (18 U.S.C. § 666). In that regard, while it is true as City Defendants state that mere speculation is insufficient, Plaintiff relies on Exhibit "B" to the pleadings which came into her possession during discovery in the 2004 MCAD proceedings.

Therefore, dismissal on these grounds is premature and are more properly addressed in a motion for summary judgment under FED. R. CIV. P. 56.

### E.     Municipal Immunity for Tortious Interference

City Defendants at MEMORANDUM, Part III. "H," pp. 22 assert MASS. GEN. L. ch. 258 § 10(c). Plaintiff concurs with City Defendants and request the opportunity to replead, *infra.*

### F.     Failure to Assert Claim Againt Moore Defendant

City Defendants at MEMORANDUM, Part III. I," p. 23 assert immunity as to the City (*supra*) and failure to state with respect to defendant Moore. Plaintiff concurs with City Defendants and request the opportunity to replead, *infra.*

IV.  <u>CONCLUSION</u>

For the reasons stated herein, City Defendants' motion to dismiss should be denied with the exception of those instances under Rule 12(b)(6) in which Plaintiff asks for an opportunity to replead. Since the Rule 19 Defendant ADMINISTRATOR has indicated it will file its own Rule 12 challenges, Plaintiff moves that the Court's consideration of the City Defendants motion and this response be held in abeyance until the ADMINISTRATOR'S filings.  Thereafter, Plaintiff's motion for leave to amend will be responsive to both City and Administrator.

Respectfully submitted,


By: /s/ Daniel J. Shea (ECF)
     DANIEL J. SHEA
     B.B.O.# 652896
     1928 West Bell Street
     Houston, TX 77019-4814
     (713) 942-7500 Telephone
     (713) 942-7507 Telecopier
     (832) 647-3612 Mobile
     **djs7500@aol.com**

ATTORNEY FOR PLAINTIFF


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NFC) and paper copies will be sent to those indicated as non-registered participants on February 28, 2006


       /s/ Daniel J. Shea

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## CENTRAL DIVISION

| | | |
|---|---|---|
| LINDA JENESKI,<br>And Class of Similarly<br>Situated Individuals;<br><br>Plaintiffs;<br><br>-vs.-<br><br>CITY OF WORCESTER, MASS.;<br>STEPHEN H. WILLAND, DONALD<br>H. ANDERSON, CARLENE BULL,<br>ROBERT J. HENNIGAN, JR., DAVID<br>M. MOORE, Individually; and MASS-<br>ACHUSETTS ADMINISTRATOR OF<br>HUMAN RESOURCES;<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 05-40019-FDS |

### AFFIDAVIT OF LINDA JENESKI

My name is LINDA JENESKI. I am the Plaintiff in the above captioned case. I am over the age of eighteen years, mentally competent and not otherwise disqualified by law from making an affidavit. I have first hand knowledge of the facts hereinafter set forth and they are true and correct:

"From the time that I began my employment with the City of Worcester in 1987 until 2002, I accepted without question what I can only describe as 'common knowledge' to the effect that with a few limited exceptions, e.g., police and fire, the City of Worcester was 'not civil service.' During all those years I never recall any City employee even remotely suggest otherwise. In addition, it was also 'common knowledge' that the office I worked in was called the 'City Manager's' office of employment and training (CMOET) with never an instance of anyone challenging that assertion.

"Between 2001 and September 2002, I worked as a trainer, state-wide, to train Career Center staff in the overall delivery of services under the Workforce Investment Act, a key component of which was the concept of welfare-to-work. It was my understanding that the welfare-to-work component of the law was funded, as were other welfare grants, on some type of per-capita outcome basis that allowed the CMOET to earn funds and then retain them to assist welfare-to-work recipients on an ad hoc, as-needed basis in accordance with what I generally

-1-

understood to be the flexibility that President Clinton and the Congress had built into the law. However, I had never been involved in the accounting practices associated with those funds and naturally presumed that they were kept in some type of escrow for the purposes intended.

"In the period preceding my discharge in September 2002, I was billing approximately half my work hours to the welfare grants. When I asked about changing my timesheet to reflect the time spent as a trainer for those grants, I was instructed by Donald Anderson and Carlene Bull not to bill to those grant accounts which made me suspicious. Then, just before my discharge, in a staff meeting, I challenged Dr. Willand's assertions that there was no money to fund staff while knowledge began to circulate that he was spending extravagant amounts of money to lease and lavishly furnish an office separate from the Career Center operation. I believe in retrospect that this is the reason I was discharged.

"After my discharge, my attorney filed a claim for me with the MCAD. It was during the MCAD proceeding that materials we obtained in discovery revealed the extent to which welfare funds were being diverted to the extravagant office use rather than helping disadvantaged people get off welfare into gainful employment. Then I learned from Ms. Wing from Franklin-Hampshire that civil service might be applicable to my situation. Shortly after that, I learned that my attorney, Mr. Hennigan, had been hired by the City to represent it in a civil rights case which appeared to me that he was playing both sides of the table. I then realized that there was an obvious conspiracy involved between the city attorney, Mr. Moore, and Mr. Hennigan and what that meant in terms of his disloyalty to me, especially since they hired him after I did. I then fired Mr. Hennigan and, after learning about what I now call the 'civil service scam,' I hired new counsel, Mr. Shea, and filed this lawsuit. I have not been required to pay for any of his services and it is my agreement that he will only be compensated if he is successful and only in an amount that the court approves. To the contrary, Mr. Hennigan never revealed to me that this is the way that attorneys are compensated for successful civil rights cases and instead required that I pay him up front."

AFFIANT SAYS NOTHING FURTHER.

Signed under pains and penalties of perjury this 25th day of February, 2006.

LINDA JENESKI

-2-