**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| LINDA JENESKI, | § | |
| And Class of Similarly | § | |
| Situated Individuals; | § | |
| | § | |
| Plaintiffs; | § | |
| | § | |
| -vs.- | § | |
| | § | |
| CITY OF WORCESTER, MASS.; | § | NO. 05-40019-FDS |
| STEPHEN H. WILLAND; DONALD | § | |
| H. ANDERSON; CARLENE BULL; | § | |
| ROBERT J. HENNIGAN, JR.; DAVID | § | |
| M. MOORE; and RUTH N. BRAM- | § | |
| SON, Individually and as Massachusetts | § | |
| Administrator of Human Resources; and | § | |
| As Successor-in-Interest to Her Indi- | § | |
| vidual and Official Predecessors; | § | |
| | § | |
| Defendants. | § | |

<u>**PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED**</u>

<u>**COMPLAINT AND TO MAKE A MORE DEFINITE STATEMENT**</u>

<u>**(WITH SUPPORTING AUTHORITY)**</u>

LINDA JENESKI, on her own behalf and that of the putative class, requests leave of court

to file an amended pleading, to wit, *Plaintiff's Second  Amended Complaint and to Make a More*

*Definite Statement (With Supporting Authority)*.  The proposed pleading is attached.

<u>A.  Introduction</u>

1.      Plaintiff is LINDA JENESKI.  She is an individual and potential lead member of a

Class of Similarly Situated Individuals.

2.      Defendants are the City of Worcester, various employees thereof, Attorney Robert

J. Hennigan, Jr., and Ruth M. Bramson, Individually and as Administrator, Division of Human

Resources, Commonwealth of Massachusetts and as Successor-in-Interest to Her Individual and Official Predecessors.

3.      Plaintiff sued defendants City, State, and their employees for civil rights violations. In addition, defendant Hennigan is sued as part of the civil rights conspiracy and for supplemental state law claims of breach of fiduciary duty and breach of contract.  The Administrator was added in the First Amended Complaint as part of the civil rights conspiracy and to effectuate permanent injunctive relief.

4.      All Defendants have answered.

5.      An initial conference was held before the addition of Administrator.

## B.  Argument

6.      Unless the opposing party can show prejudice, bad faith, or undue delay, a court should grant leave to file an amended pleading.  *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962).  Leave to amend should be freely given when justice so requires.  FED. R. CIV. P. 15(a); *Walton v. Mental Health Ass'n*, 168 F.3d 661, 665 (3d Cir. 1999).

7.      The court should allow the filing of Plaintiff's second amended complaint because it provides the more definite statement of the case previously ordered by the Court and is responsive to the motions to dismiss by City and Administrator arising from the previous live complaint.

8.      The defendants  will not be prejudiced by Plaintiff's amended complaint because, in the case of the City and Administrator, motions to dismiss have been filed on grounds of pleading defects.  "Generally, a court will not dismiss [under 12(b)(6)] without leave to amend on the first challenge to plaintiff's complaint."  *Curley v. Perry*, 246. F.3d 1278, 1281-82 (10th Cir.2001).

9.      None of the Defendants can be prejudiced because this amendment takes place at a preliminary stage in the litigation.

10.     Plaintiff is filing her amended pleading along with this motion.

C.  Conclusion

11.     For the reasons set forth herein, Plaintiff asks the court to grant leave to file the amended pleading.

Respectfully submitted,

DANIEL J. SHEA, P.C.

By:    /s/Daniel J. Shea, ECF
                 DANIEL J. SHEA
                 B.B.O.# 652896
                 1928 West Bell Street
                 Houston, TX 77019-4814
                 (713) 942-7500 Telephone
                 (713) 942-7507 Telecopier
                 (832) 647-3612 Mobile
                 djs7500@aol.com

ATTORNEY FOR LINDA JENESKI
AND PUTATIVE CLASS

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 5, 2006.

/s/ Daniel J. Shea

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| LINDA JENESKI, | § | |
| And Class of Similarly | § | |
| Situated Individuals; | § | |
| | § | |
| Plaintiffs; | § | |
| | § | |
| -vs.- | § | |
| | § | |
| CITY OF WORCESTER, MASS.; | § | NO. 05-40019-FDS |
| STEPHEN H. WILLAND; DONALD | § | |
| H. ANDERSON; CARLENE BULL; | § | |
| ROBERT J. HENNIGAN, JR.; DAVID | § | |
| M. MOORE; and RUTH N. BRAM- | § | |
| SON, Individually and as Massachusetts | § | |
| Administrator of Human Resources; and | § | |
| As Successor-in-Interest to Her Indi- | § | |
| vidual and Official Predecessors; | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S PROPOSED SECOND AMENDED COMPLAINT**

**FOR WHICH LEAVE TO FILE HAS BEEN REQUESTED**

COMES NOW LINDA JENESKI and, submits under cover of a motion for leave, her

*Proposed Second Amended Complaint* to invoke the jurisdiction of this Honorable Court to award

her affirmative relief, and permanent injunctive relief against the above captioned parties in their

corporate or individual capacities, as hereinafter set forth.  She also invokes this Court's jurisdiction

to seek affirmative relief for a Class of Similarly Situated Individuals pursuant to FED. R. CIV. P. 23.

## I.  JURISDICTION

1.      This Court has jurisdiction in that the civil actions hereinafter pled arise under the

Constitution, laws, or treaties of the United States.  28 U.S.C. § 1331.  The Constitutional depriva-

tions are those of equal protection of the laws and due process, U.S. CONST. Amends. V and XIV,

as statutorily implemented at 42 U.S.C. §§ 1983, and 1985(3) *et seq*.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) in that the state tort law claims herein form part of the same case or controversy under Article III of the United States Constitution.

## II.  PARTIES

2.    Plaintiff LINDA JENESKI is a citizen of Worcester County, Massachusetts.  She has the capacity to sue in that she can demonstrate an injury in fact, causation, and redressability.  The nature of the Plaintiff and Putative Class's injury is deprivation of constitutionally protected due process and equal protection of the law that is the proximate cause of their economic damages.

3.    The putative CLASS of similarly situated individuals are those who, like LINDA JENESKI, have been deprived of due process and equal protection of the law, to wit, those who have been unequally deprived of the rights and protections afforded to all citizens of the Commonwealth of Massachusetts under its Civil Service Laws, MASS. GEN. L. ch. 31 *et seq*.  More definitely, the Class consists of those individuals against whom adverse employment decisions were made without the affected employee having an opportunity, equal to other citizens of Massachusetts, to challenge those decisions under the civil service laws.

4.    Defendant CITY OF WORCESTER is a Massachusetts municipal corporation that was served through its City Clerk, Mr. David Rushford at Worcester City Hall, 455 Main St., Worcester, MA 01608.  CITY has appeared and answered.

5.    Defendant STEPHEN R. WILLAND is a natural person and resident of Worcester County, MA.  He was be served at his principal place of business at c/o Regional Employment Board, 44 Front St., 3rd Floor, Worcester, MA 01608.  He is named herein in his individual capacity in addition to being an employee of CITY.  He has appeared and answered.

6.    Defendant DONALD H. ANDERSON is a natural person and resident of Worcester

County, MA.  He was served at his principal place of business at c/o Workforce Central, 44 Front St., 7th Floor, Worcester, MA 01608.  He is named herein in his individual capacity in addition to being an employee of CITY.  He has appeared and answered.

7.     Defendant CARLENE BULL is a natural person and resident of Worcester County, MA.  She was served at her principal place of business at c/o Workforce Central, 44 Front St., 7th Floor, Worcester, MA.  She is named herein in her individual capacity in addition to being an employee of CITY.  She has appeared and answered.

8.     Defendant ROBERT J. HENNIGAN, JR. is a natural person and resident of Worcester County, MA.  He was served at his principal place of business at 390 Main St., Worcester, MA 01608.  He is named herein in his individual capacity in addition to being a former employee of CITY.  He has appeared and answered.

9.     Defendant DAVID M. MOORE is a natural person and resident of Worcester County, MA.  He may be served at his principal place of business at c/o Office of the City Solicitor, City Hall Room 301, 455 Main St., Worcester, MA 01608.  He is named herein in his individual capacity in addition to being an employee of CITY.  He has appeared and answered.

10.    Defendant RUTH N. BRAMSON is an Individual and Official known as the MASSACHUSETTS ADMINISTRATOR OF HUMAN RESOURCES.  The Administrator  is a statutorily created position within the Massachusetts Executive Office of Administration and Finance charged, in pertinent part, "[t]o administer, enforce and comply with the civil service law and rules."  MASS. GEN. L. ch. 31 §§ 5(a) and 77.   Service has been effected upon the "Administrator" though the Office of the Attorney General, Commonwealth of Massachusetts, Government Bureau, One Ashburton Place, Room 2019, Boston, MA 02108-1698 and upon General Counsel, Human Resources Division, One Ashburton Place, Room 207, Boston, MA 02108-1518.

This amendment serves, *inter alia*, to notify her that she is being sued in both her Individual and Official Capacities.  She is also a successor-in-interest to her similarly situated predecessors.

### III.  CLASS CERTIFICATION

11.    Class certification is sought in this case pursuant to FED. R. CIV. P. 23(a) in that the claims of LINDA JENESKI raise questions of law and fact common to a class of similarly situated individuals, her claims are typical of the class, the class is so large that joinder of all members is impracticable, and she and her counsel will adequately protect the interests of the class.

### IV.  VENUE

12.    Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391.

### V.  FACTS

13.    The constitutional violations that form the basis of this suit began with the illegal issuance by City of Worcester of an Executive Order on November 13, 1972 which prescribes, *inter alia*, that ". . . all officers and employees of the Executive Office are executive appointees and, therefore, shall not be subject to the requirements of the Civil Service Law."  That Order is attached hereto as Exhibit "A," and incorporated herein by reference as if set forth at length.[1]  Limited disclosures, Exhibit "C," discussed *infra*, indicate that the 1972 Order was issued while a "Memorandum of Agreement," signed June 23, 1973, was in the process of development.

14.    Plaintiff is a Master's Degreed professional.  In 1988 plaintiff became the supervisor of the Career Assessment Unit stationed at the Welfare Offices of the so-called City Manager's Office of Employment and Training (CMOET)Grant implementation was a major part of plaintiff's

---

[1] The Massachusetts Civil Service Law exempts certain individuals from civil service protection where it states, in pertinent part, that "[t]he following shall be exempt from the civil service law and rules, unless expressly made subject thereto by statute: . . . City and town managers and assistant city or town managers, and administrative assistants, secretaries, stenographers, clerks, telephone operators and messengers connected with the offices of city councils, town councils, mayors, city managers, town managers and selectmen."  MASS. GEN. L. ch. 31 § 48.

responsibilities. Plaintiff thus became involved in so-called "authorized spend-downs," *i.e.*, alternative ways to use state and federal funds to serve clients in a manner prescribed by law.[2]

15.    In 1993 or 1994, plaintiff inquired of defendant BULL about excess welfare-to-work earnings and why they were *not* being used to extend client services in the manner intended by law.[3] Plaintiff was told by defendant WILLAND it was not part of her job. Upon information and belief, the BULL defendant reports to the ANDERSON defendant on the organizational chart of "Workforce Central," but *de facto*, reports to the WILLAND defendant.

16.    From 1994 until her abrupt discharge in 2002, Plaintiff would question the BULL defendant about the propriety of charging time on time-sheets to grants other than those on which she actually worked. Plaintiff became concerned enough about this practice that she would not sign time sheets until she received confirmation, preferably in writing, from the department director or the fiscal coordinator, the ANDERSON and BULL defendants, respectively.

17.    Between August 1998 and July 2000, the federal funding program known by plaintiff as the Job Training Partnership Act (JTPA) was superseded by the new Workforce Investment Act (WIA). Thus, among the office staff, there was much discussion about the differences between "Jitpa" "Weeah," e.g., the "firewall of integrity" and "separation" required by WIA between the Regional Employment Board (REB) – [under WIA the Workforce Investment Board (WIB)] and

---

[2] The CMOET anagram has significance for the illegal conduct that gives rise to this lawsuit. By adding the prefix "City Manager" to city departments, the defendant City of Worcester has been able, since 1972, to unlawfully circumvent the State's civil service laws, MASS. GEN. L. ch 31 *et seq.*, by "historically considering" those offices "exempt." In 2004, the City has admitted that it needs state legislative approval to exempt these departments. This conduct is criminalized in the civil service laws. *See* MASS. GEN. L. ch. 31 § 74. This is the criminal conduct at the state level that enables the federal due process and equal protection violations.

[3] What the funds were actually being used for would only appear later, *infra.* Nevertheless, in hindsight, it appears that at this point she was beginning to get some perception of misapplication of funds in violation, later learned, of 18 U.S.C. § 666.

her office (CMOET).[4]

18.    Between July 2000 and September 2002, plaintiff suspected that earned but unexpended welfare funds, in which her unit was involved, were being used to support the Regional Employment Board (at that point, still not renamed as the Workforce Investment Board "WIB" as required by WIA) but she was unaware, until advised by counsel, of the felony implications of this conduct on the part of the WILLAND defendant.

19.    From 2001 until her abrupt and wrongful termination in September 2002, plaintiff worked as a trainer, state-wide, and earned additional funds for CMOET which she suspected were being used by the Regional Employment Board Director, the WILLAND defendant.[5]

20.    Regarding the above mentioned "additional funds," Plaintiff asked the ANDERSON defendant how the time should be entered in the time sheet. ANDERSON forwarded the question to the BULL defendant who told plaintiff not to enter it on the time-sheet, thus providing the WILLAND, ANDERSON, and BULL defendants with another surplus source of funds.

21.    Prior to the plaintiff's abrupt "layoff" in September 2002, she and other staff members had been informed by the WILLAND defendant of the need for early retirements. Some staff members offered hourly reductions to save co-worker's jobs. However, plaintiff had the temerity to challenge the WILLAND defendant's assertions of insufficient funds in light of a new

---

[4] *See* 29 U.S.C. § 2832(f)(1)(A).

[5] At this point plaintiff perceives that the conduct of the WILLAND defendant is merely inappropriate in that although extravagant, the expenditure of funds does not appear to her to be a conversion for personal use. To the contrary, *see* 18 U.S.C. § 666 and *United States v. Westmoreland,* 841 F.2d 572, 576 (5th Cir. 1988), *cert. denied,* 488 U.S. 820 (1988)(Congress desired to protect the integrity of federal funds by assuring the integrity of the organization or agencies that receive them); *see also United States v. Rooney*, 986 F.2d 31, 34 (2nd Cir. 1993). For the use of "misapplication," see Jury Instruction 6.18.666A which, when applied here, means that to "misapply" means to use the funds or property of City of Worcester knowing that such use is unauthorized, or unjustifiable, or unlawful. Misapplication includes the wrongful taking or use of the money or property of City of Worcester by him as its Agent, for his own benefit, the use or benefit of some other person, or an unauthorized purpose, even if such use benefitted the City of Worcester.

$800,000.00 grant.  The WILLAND defendant demurred and plaintiff was discharged in September 2002.  A co-worker, Paul Quinn was also discharged, but he was later re-hired.

22.    After her discharge, plaintiff retained the HENNIGAN defendant and his firm to represent her.  She was advised by HENNIGAN to file a Title VII age and sex discrimination claim. HENNIGAN did not disclose that he was the author of or in any way involved with the development of the City's 1996 Plan of Reorganization which explicitly stated that the department in which plaintiff worked was to be called "Executive Office of Employment and Training," [quotation marks original], rather than "City Manager's Office of Employment and Training 'CMOET,'" as it was so named at all times relevant herein.  Thus, from 1996 onward, and, upon information and belief for the entire tenure of his employment with the City that stretches back to his position as an Assistant City Solicitor in the 70's, and as a Council Member in the 80's, HENNIGAN was aware of the 1972 unlawful civil service exemption that created an invidious class of employees within Massachusetts by means of an equal protection violation which falsely prefaced "City Manager" to various departmental titles, *infra*, to create an invidious class of employees who, unlike other civil servants in Massachusetts, were deprived on the legislatively enacted, civil service, due process protections by unlawfully invoking MASS. GEN. L. ch. 31 § 48.  Indeed, Ms. Jeneski had told Hennigan that her Franklin Hampshire Service Delivery Area counter-part, Sara Wing, had raised the civil service issue with her.  In addition, Attorney Elaine Baltas, acting as a consultant to Ms. Jeneski, provided the HENNIGAN firm with a copy of the above cited civil service laws with the question as to their applicability.  Ms. Baltas, laid-off *circa* 1996, is a potential class member.  Under the circumstances, HENNIGAN, as an attorney, had a duty to disclose his actual knowledge of this state of illegality and its implications for her wrongful discharge.   Instead, plaintiff spent in excess of $10,000.00 with HENNIGAN to pursue a fruitless claim before the Massachusetts Commission Against

Discrimination (MCAD) when instead, the matters brought fourth in this suit were highly relevant to the unlawful motives behind her wrongful discharge and arguably, could have been brought forward in this forum in this manner.  In effect, HENNIGAN had actual knowledge of the due federal equal protection and due process violations arising out of the unlawful civil service exemption, yet chose not to do so because of his conflicted relationship with the City, and more specifically, with the MOORE Defendant, Individually, as set forth more fully below.[6]  Hennigan also breached his fiduciary duty to Ms. Jeneski by failing to disclose to her the Congressional intent behind § 1988 statutory attorneys' fees that enable him to act as a private attorney general to vindicate her rights without the necessity of collecting up-front payment.

23.    Several days before a probable cause hearing before the MCAD, plaintiff learned in the Worcester Telegram & Gazette (T&G) that HENNIGAN had been hired by the defendant City to represent it as a defendant in an employment discrimination case in federal court in Boston.  She confronted the HENNIGAN with the patent disloyalty and lack of disclosure and discharged him. A subsequent review of the HENNIGAN work product led the MCAD to dismiss for lack of presentation of any admissible evidence.[7]

24.    The MCAD action was not without benefit to the plaintiff, however.  In the course of discovery in that case, plaintiff timely learned of the slush-fund of welfare monies used to support

---

[6]  As further evidence of the entangled relationship, while Mr. Hennigan was representing the City as a defendant, he was, upon information and belief, "brought in" by the Moore defendant to represent the current City Manager, Michael O'Brien, to handle the latter's contract negotiations with the City.

[7]  Plaintiff had a strong direct evidence case had the deposition of her co-worker Mr. Quinn been taken.  Instead, all that was submitted to the MCAD was Ms. Jeneski's hearsay affidavit which did not even comport with the requirements of Rule 56 for first hand knowledge.  One cannot but conclude that plaintiff's perception of disloyalty had come to fruition.  It is also significant that the HENNIGAN defendant, while representing the defendant City in an employment matter, also, according to the Worcester Telegram & Gazette (T&G), represented the current City Manager, Michael O'Brien, former parks director, in his City Manager's employment contract negotiations with the City in 2004. Thus appears the circumstantial evidence which points to conspiratorial conduct of the City Solicitor, the  MOORE defendant.

the WILLAND defendant's extravagant executive life-style as evidenced in Exhibit "B," attached hereto and incorporated herein by reference as if set for at length.  Plaintiff contends that Willand's criminal conduct is merely a symptom of the breeding ground of arbitrary and capricious behavior otherwise known as Worcester city government.

25.    The presumed exemption from civil service protection was a widespread mis-understanding among the affected employees based on the long standing affirmative mis-representations and concealments of the City, its Legal Department, and Human Resources Department.    Significantly, this situation only began to surface in a letter from the City Manager to the Council on September 28, 2004 which states the following:

> Civil Service Corrective Legislation.  This reorganization plan also contains my recommendation for Home Rule Legislation which would acknowledge the historical practice of considering a large number of employees within the Executive Office of the City Manager as *exempt* from Civil Service.  These positions include those in the Budget Office, Development Office, Neighborhood Services, Elder Affairs, *Human Resources and Employment and Training*.  The City Solicitor advises me that the legal basis for treating these positions as exempt has become more questionable over time and has recommended that the City seek special legislation to place these exemptions on unassailable legal ground.

Michael V. O'Brien, Letter to Council, September 28, 2004, pp. 12-13 (emphasis added).

26.    Nothing in the September 28, 2004 submission indicated that it was anything other than the submission of a finalized proposed Plan of Reorganization.  Yet, after Ms. Jeneski's appearance at the MCAD on October 20, 2004 at which the "civil service scam" was brought to the attention of the MCAD by successor counsel, the City Manager found it necessary to submit a revision to that Plan on November 16, 2004, ". . . so as to correct typographical errors, and in a few places, make changes of substance" in the following particulars:

> In accordance with the City Solicitor's recommendation, I am submitting this revised edition of the Citywide Reorganization Plan as a separate plan in light of the reorganization plan now pending before the municipal operations committee.  Under

the City Charter, the City Council must refer this plan to a committee for a public hearing and report back to Council. I recommend a favorable report from the Committee and, upon receipt of that report, a favorable report of the City Council. With the submission of this revised plan, I wish to withdraw my original submission and recommend that the Council simply place that plan on file.

My original submission to Council included requests for authority to file two Home Rule petitions concerning the civil service status of city employees. *These requests were not technically part of the reorganization plan and may be deliberated by council without regard to the procedural requirements of the City Charter for Reorganization Plans.* The primary legislation would remove the chiefs and deputy chiefs of the Police and Fire Departments from civil service. The Municipal Operations Committee has expressed a number of concerns with that legislation and I respectfully request this item to remain in Committee for such additional time as may be required for me to respond to the concerns of the Committee.

The second legislative request concerns the civil service status of other, non-public safety, City Departments. *This legislation would acknowledge the historical practice of the City considering a large number of employees within the former Executive Office of the City Manager as exempt from civil service.* The legislation also included Civil Service exemptions for other departments that were not part of this historical practice (Purchasing, City Clerk, Library, Veteran's Services, Auditing & Law. I have revised the proposed legislation to make this distinction clear with Section One addressing the historically exempt offices and Section Two addressing the others. I urge Council to act now to approve the filing of this petition and have attached the revised legislation with a draft form of Council Order which would authorize its filing.

Michael V. O'Brien, Letter to Council, November 16, 2004, pp. 1-2 (emphasis added).

27.    But for a front page article in the <u>Worcester Telegram & Gazette</u> on December 8, 2004, headlined, "O'Brien Reorg OK'd," the City's attempt to "fly under the radar of public hearings" its decades long unlawful practices would not have come to the plaintiff's attention nor would this lawsuit have been filed. The T&G article states, in pertinent part, "[a]s part of the reorganization plan, the council also approved an order authorizing the city manager to file legislation to exempt from Civil Service laws positions in the Executive Office of the City Manager and some other departments, which have traditionally been considered exempt from Civil Service."

28.    The 2004 Plan proposal, *infra*, also continues to refer to the defunct Job Training and

Partnership Act (1988) which supports plaintiff's contentions of ongoing violations of 28 U.S.C. 2832(f)(1)(A). Under the JTPA, what are now "Workforce Central" and the "Regional Employment Board" were lawfully structured as a single entity. However, under the WIA, the legislation requires separate structures which dis-allow the "W.I.B. Director" from siphoning funds from the statutory "One Stop Provider." This statutory violation, for a period now in excess of seven years, *is prima facie* evidence of some of the conspiratorial "illegal ends" alleged herein under § 1985.

29.     The City's relationships are further complicated. The current "Administrator" of the Massachusetts Department of Human Resources, RUTH N. BRAMSON, since 2003, has had actual knowledge of the illegal state of affairs described herein, as did all her relevant predecessors. Rather than acting in her official capacity and exercise her non-delegable enforcement obligations vis a vis City of Worcester, she has, because of MASS. GEN. L. ch. 31 § 74, acted criminally, *ultra vires,* and Individually, and with a consipri-torial meeting of the minds with City of Worcester to continue to deprive Ms. Jeneski and the Class of their rights to equal protection of the laws. This is evidenced by her unlawful delegation of her duties "[t]o administer, enforce and comply with the civil service law and rules" under MASS. GEN. L. ch. 31 § 5(a) to the City of Worcester Department of Human Resources thus placing the City in charge of its own statutory oversight. The delegation at issue is set forth in a "Memorandum of Understanding" from "Division of Personnel Administration" to the Worcester City Manager dated June 23, 1973, attached hereto as Exhibit "C" and incorporated herein by reference. The Memorandum appears to memorialize a prior understanding between the parties that resulted in the issuance of Exhibit "A" the previous November. The ". . . specific functions to be *delegated* are described and detailed in the Attachments to [the] Memorandum." However, no attachments bearing the same date have been provided in initial disclosures. Significantly, the Personnel Administrator had enforcement and not delegation authority.

30.     Thereafter, a more restrictive delegation was sent to the City by the relevant statutory authority at the time, the "Division of Civil Service," dated July 31, 1974, attached and incorporated as Exhibit "D."  This letter, unlike the previous Memorandum of June 23, 1973, cites MASS. GEN. L. ch. 31 § 2A(o) which then allowed the Commission "[t]o delegate the administrative functions of the civil service system, so far as practicable, to the various state agencies and cities and towns of the commonwealth."[8] Significantly, Exhibit "D" acknowledges, *de jure*, that the Director of Civil Service ". . . retain[s] responsibility . . . to insure compliance with the Civil Service Law and Rules" unlike the Memorandum which contains no such statutory restriction.  Further, Exhibit "D" makes no reference as to the existence of Exhibit "C," nor does Exhibit "C" show distribution to the Civil Service Commission, unlike Exhibit "D."  Thus, the Memorandum is evidence of the unlawful delegation of civil service authority to the City by the Commonwealth's Personnel Administrator, without notice to the independent Civil Service Commission.  That direct evidence of criminal conduct, together with circumstantial evidence, forms part of the civil rights conspiracy involved in this case.  Further, and on information and belief, all Ms. Bramson's predecessors in office have acted in a similar *ultra vires* fashion and thus, plaintiff will move for leave to add them or their estates as information on them becomes available during discovery.

31.     The other "piece-of-the puzzle" emerged at the MCAD probable cause hearing, October 20, 2004, *supra*, at which, for the first time, an attorney representing City announced representation for the legislatively correct "Executive Office of Employment and Training."  Upon information and belief, that attorney is also a former City Solicitor (or assistant) who had a hand in either crafting or subsequently implementing the 1972 Executive Order which initiated the "City

---

[8] Chapter 31 was extensively revised in 1978 and § 2A(o), cited in the letter, is now found at Chapter 31 § 5(l). Appafrently, the limited delegation authority was transferred to Administrator in the 1976 revisions.

Manager's" unlawful exemption.  Thus, that attorney, Mr. D. Moschos, will be, at the very least, a fact witness in this case.

32.    As a direct and proximate result of the 1972 Executive Order and the ongoing civil rights conspiracy associated with it, there has been created an invidious class of employees within the Commonwealth of Massachusetts.  Because of the express legislative intent set forth in MASS. GEN. L. chs. 31 and 31A, that invidious Class can be characterized as "those employees of the City of Worcester who are subjected to legislatively prohibited, rampant, criminal, arbitrary-and-capricious management, exercised maliciously and in bad faith."[9]  To the contrary, the Equal Protection Clause contemplates that Ms. Jeneski and Class are to receive substantially similar treatment from their government as similarly situated individuals throughout the Commonwealth. Indeed, the principle of fair treatment on the basis of merit is so ingrained in American life (not to mention in MASS. GEN. L. chs. 31, 31A, and 74) that its systematic and criminal deprivation can only be characterized, in the words of Justice Breyer, as "vindictive action, illegitimate animus, or ill will."  It is a well known hallmark of Worcester city government which provides the breeding ground for the state tort law claims that are part of the same case or controversy.

## VI.    FIRST COUNT: VIOLATION OF CIVIL RIGHTS UNDER § 1983

33.    Plaintiff re-alleges pars. 13-32 in support of this claim.

34.    Defendant City of Worcester is the party-respondent this claim.

35.    At time of trial, plaintiff will prove that the conduct complained of (summarized herein as the unlawful civil service exemption) unequally deprived her and the class of the protection of the civil service laws of the Commonwealth as prohibited in Amends. V and XIV of

---

[9] *See Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir.2004).

the United States Constitution, as implemented in 42 U.S.C. § 1983. She also pleads that this constitutional deprivation is the proximate cause of the economic damages sustained by her and the Class. She also pleads for reasonable and necessary attorney's fees for herself and the Class under 42 U.S.C. § 1988. Because of the statutory criminalization of the conduct involved, she also asks for an award of punitive or exemplary damages for herself and the Class.

## VII.  SECOND COUNT:

## CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER § 1985(3)

36.     Plaintiff re-alleges pars. 13-32 in support of this claim.

37.     All defendants, including RUTH N. BRAMSON, Individually, are parties-respondent to her claim of conspiracy and relief is sought against all the defendants jointly and severally; the Class plaintiffs' claim is asserted against defendant City of Worcester only at this time.

38.     At time of trial, plaintiff will prove that the defendants (1) conspired, (2) to deprive, either or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators did or caused to be done an act in furtherance of the conspiracy, and (4) the plaintiff and class suffered an injury either to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy, and (5) the conspiracy was a class-based, invidiously discriminatory animus behind the conspirators actions.  The aforesaid conspiracy, prohibited by 42 U.S.C. § 1985(3), is the proximate cause of the economic damages sustained by her and the Class for which she seeks compensatory damages for herself and the Class.  She also pleads for reasonable and necessary attorney's fees for herself and the Class pursuant to 42 U.S.C. § 1988.  Because of the statutory criminalization of the conduct involved, she also asks for an award of punitive or exemplary damages for herself and the Class.

## VIII.  THIRD COUNT: WRONGFUL DISCHARGE

39.     Plaintiff re-alleges pars. 13-32 in support of this claim.

40.     Defendants City of Worcester and WILLAND, ANDERSON, and BULL are the parties-respondent this claim for which relief is sought jointly and severally.

41.     At time of trial, plaintiff will prove that the conduct of which she complains amounts to a wrongful discharge perpetrated against her to conceal criminal conduct of the defendants and that discharge is the proximate cause of her economic damages for which she seeks both ordinary and exemplary damages.  Plaintiff believes that other acts of wrongful discharge have occurred to the Class Members but for the unlawful violation of the civil service laws as set forth herein.

## IX.  FOURTH COUNT: TORTIOUS INTERFERENCE IN CONTRACT

42.     Plaintiff re-alleges pars. 13-23 in support of this claim.

43.     Defendant DAVID M. MOORE, Individually, is the party-respondent to this cause of action.

44.     At time of trial, plaintiff will prove that this defendant intentionally and tortiously interfered in her attorney-client relationship between the HENNIGAN defendant and the Plaintiff with the intent to tortiously interfere in the attorney-client relationship, owing to the defendant's long-term relationship with the Hennigan defendant.  She further pleads that this conduct is the proximate cause of her economic damages for which she seeks both compensatory and exemplary damages as provided by law.

## X.  FIFTH COUNT: BREACH OF CONTRACT AND FIDUCIARY DUTY

44.     Plaintiff re-alleges pars. 13-23 in support of this claim.

46.     Defendant HENNIGAN is the party-respondent to this cause of action.

47.     At time of trial, plaintiff will prove that this defendant intentionally and tortiously

breached his contract of employment and its related fiduciary obligations to her.  She further pleads that this conduct is the proximate cause of her economic damages for which she seeks both compensatory and exemplary damages as provided by law.

## XI.  SIXTH COUNT: CONSPIRACY TO BREACH CONTRACT

### AND FIDUCIARY DUTY

48.    Plaintiff re-alleges pars. 13-23 in support of this claim.

49.    Defendant HENNIGAN, and MOORE, Individually, are the parties respondent to this cause of action from which she seeks relief jointly and severally.

50.    At time of trial, plaintiff will prove that these defendants intentionally and tortiously conspired to breach the attorney client contract and its related fiduciary obligations to her.  She further that (a) there was a meeting of the minds among the defendants, (b) to achieve an unlawful end using unlawful means and (c) that the conspiracy is the proximate cause of her economic damages for which she seeks both compensatory and exemplary damages as provided by law.

## XII.  LIMITATIONS AND IMMUNITY

50.    Plaintiff further pleads that all statutes of limitations with respect to herself and the putative class are tolled by the doctrine of fraudulent concealment, back to 1972.

52.    The state parties have no immunity to the civil rights claims.  *See Monell, et al. v. Dept. of Social Svc's, City of New York*, 436 U.S. 658 (1978).

## XIII.  MOTION FOR CLASS CERTIFICATION

53.    Plaintiff moves pursuant to FED. R. CIV. P. 23 that at an appropriate time to be determined by the Court, the matter of class certification be heard and determined.

## XIV.  REQUEST FOR PERMANENT INJUNCTION

54.    Plaintiff also requests that upon completion of trial of this case, a permanent

injunction issue to prevent further violations of the unlawful conduct cited herein. In that regard she seeks permanent injunctive relief against the City and State actors in both their Individual and Official capacities.

XV.  REQUEST FOR RELIEF

55.    Upon trial of the cause, Plaintiff asks that she and the Class have the damages sought in specified in each count. She also requests class certification. She also asks for permanent injunctive relief. She also asks for reasonable and necessary attorneys' fees as provided by law. She asks for such other and further relief, general or special, whether at law or in equity, to which she may be justly entitled.

Respectfully submitted,

DANIEL J. SHEA, P.C.


By:____/s/Daniel J. Shea, ECF_____
          DANIEL J. SHEA
          B.B.O.# 652896
          1928 West Bell Street
          Houston, TX 77019-4814
          (713) 942-7500 Telephone
          (713) 942-7507 Telecopier
          (832) 647-3612 Mobile
          djs7500@aol.com

          ATTORNEY FOR LINDA JENESKI
          AND PUTATIVE CLASS

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 5, 2006.

_____/s/ Daniel J. Shea_____

AN EXECUTIVE ORDER RELATIVE TO THE
ORGANIZATION OF THE EXECUTIVE OFFICE
OF THE CITY MANAGER

WHEREAS: The City operates under a Council-Manager form of govern-
ment (G.L. Chapter 43, Section 93, et. seq.); and

WHEREAS: The City Manager is the Chief Executive Officer of the
City of Worcester (G.L. Chapter 43, Section 104); and

WHEREAS: The City Manager may establish regulations by virtue
of Chapter 43, Section 106; and

WHEREAS: The federal government has established various programs
under the jurisdiction of local chief executives,
including Law Enforcement Planning (Executive Order #3);
Manpower Planning (Executive Order #2) and 701 Planning
(Executive Order #7); and

WHEREAS: The City Council has placed the administration of the
Human Rights Commission within the Executive Office
of the City Manager;

NOW, THEREFORE, I, Francis J. McGrath, by virtue of the authority
vested in me as City Manager do hereby order as follows:

1) That the Executive Office of the City Manager
shall consist of the following units:

a) Administrative Office

b) Criminal Justice Planning Office

c) Manpower Planning Office

d) Planning and Community Development Office
e) Office of Human Rights
f) Office of Human Service Programs

**EXHIBIT**

tabbies®

" A "

2) That the officer in charge of the above mentioned
Offices shall be as follows:

- 2 -

    a) Administrative Assistant to the City Manager:
       Administrative Office (D. Bunting)

    b) Administrator of Law Enforcement Planning:
       Criminal Justice Planning Office (J. Wheeler)

    c) Director of Manpower Planning:  Manpower
       Planning Office (R. Makela)

    d) Planning Director:  Planning and Community
       Development Office (G. McNeil)

    e) Executive Director, Human Rights Commission:
       Office of Human Rights (S. Levinson)

    f) Director, Office of Human Service Programs:
       Office of Human Service Programs (J. Ford)

3) That staff supervision shall be exercised over the
above offices as follows:

    a) Administrative Office:  City Manager

    b) Criminal Justice Planning Office:  City Manager

    c) Manpower Planning Office:  Director of Human
       Service Programs

    d) Planning and Community Development Office:
       Planning Director

    e) Office of Human Rights:  Human Rights Commission

    f) Office of Human Service Programs: Director of
       Human Service Programs

4) That the coordination of the various offices shall be
exercised by the Assistant to the City Manager  (Executive).

5) That it shall be the duty and responsibility of each
officer in charge:

    a) To prepare annually the goals and objectives
       of the office for approval of the staff
       supervisor and City Manager.

    b) To prepare annually, by December 1, for the
       Budget Officer, the administrative budget of
       the office and to coordinate their fiscal
       affairs with the budget officer.

    c) To prepare the program and program budget

d) To direct, supervise and evaluate employees of the office, including establishing work schedules, assignments and performance requirements.

e) To establish internal administrative procedures for the office in accordance with this Order and other applicable guidelines.

f) To keep the City Manager advised on a regular basis of significant program developments, changes in law affecting his area, and personnel actions.

g) To perform the duties prescribed by ordinance or executive order.

h) To perform such other duties as may be required by the staff supervisor or the City Manager.

6) That relationships between the Executive Office or its units, and legislative bodies or other governmental units, shall be reserved exclusively for the City Manager.

7) That all units shall maintain books and records in accordance with established business procedures and shall keep separate and distinct books and records for federal and state grant-in-aid funds and programs.

8) That no unit, except the Administrative Office, shall use stationery headings which does not include therein a verbalization of their unit designation. Units may use the following headings:

Executive Office of City Manager

Office of _____

or

City Manager's Office of _____

9) That all officers and employees of the Executive Office are executive appointees and, therefore, shall not be subject to the requirements of the Civil Service Law. Except

- 4 -

ιor Civil Service, all appointees shall be entitled to the same
benefits received by all other City employees.

10) That all officers and employees shall notify the
City Manager of any outside interest including consulting work
or significant business activities that they may perform. All
officers and employees shall devote their full time during
business hours to their duties and shall be available for such
assignments that may be required after office hours.

11) That no officer or employee shall participate in
partisan political activities or have any connection whatsoever
with any political activities involving municipal elections in
the City of Worcester.

12) That no officer or employee shall be authorized to
sign in behalf of the City Manager or be authorized to use his
name, except the Executive or Administrative Assistants of the
City Manager.

13) That every officer and employee within thirty days
of his employment shall read and be acquainted with the Conflict
of Interest Law (G.L. Chapter 268A).

14) That all units shall comply with the statutes, ordin-
ances and City's Administrative Directives and Executive Orders
as may be applicable.

15) That each employee, upon his appointment, shall be
given a copy of this order by the officer in charge of his unit.

Ordered at City Hall
November 13, 1972

Francis J. McGrath
City Manager

Revised: 10-1-75

City Manager's Office of Employment & Training
Reconciliation of Organization 31S459 (Performance Earnings)
From Inception 1997 through June 30, 2003



**Cash Received:**

| | | |
|---|---|---:|
| From FY93 Welfare Training | $ | 132,998.46 |
| From FY94 Welfare Training | | 78,594.87 |
| From FY95 Welfare Training | | 29,505.77 |
| From FY96 Welfare Training | | 212,959.69 |
| From FY97 Welfare Training | | 170,574.99 |
| From FY98 Welfare Training | | 106,848.54 |
| From FY99 Welfare Training | | 218,462.87 |
| From FY00 Welfare Training | | 165,467.05 |
| From FY01 Welfare Training | | 100,045.02 |
| From FY02 Welfare Training | | 32,118.74 |
| From 31S113 FY99 Title III - transfer for exps. no longer needed | | 2,097.15 |
| From Performance Earnings II (from FY00 admin cost pool 31S117) | | 34,177.34 |
| Additional Earnings from FY00 Refund (deposit 03/13/02) | | 2,274.14 |
| Total Cash Received | $ | 1,286,124.63 |

**Expenses:**

| | | |
|---|---|---:|
| FY99 Mass Jobs REB (31S110) | $ | 42,896.09 |
| FY00 Vets (31S151) | | 218.13 |
| Registration to attend annual meeting | | 36.00 |
| Admin Expenses | | 39,161.45 |
| SRW - Car | | 14,665.95 |
| Transfer to FY99 Title IIC (31S112) | | 20,253.85 |
| Transfer to FY99 Title III (31S113) | | 2,097.15 |
| Transfer to FY99 Operations (31S115) | | 7,919.94 |
| FY00 REB (31S137) | | 23,457.61 |
| FY00 Admin Costpool 31S142 | | 18,057.95 |
| Guertins Graphic - T-Shirts Cancer Walk  FY2002 | | 2,450.00 |
| Total Expenses: | $ | 171,214.12 |

Loans:

| | |
|---|---:|
| Outstanding loan @ 06/30/03 31S198 | 50,000.00 |
| Outstanding loan @ 06/30/03 31S201 | 15,000.00 |

| | | |
|---|---|---:|
| Outstanding loan @ 06/30/03 31S202 | | 20,000.00 |
| Outstanding loan @ 06/30/03 31S208 | | 50,000.00 |
| Outstanding loan @ 06/30/03 31S209 | | 50,000.00 |
| Outstanding loan @ 06/30/03 31S212 | | 5,000.00 |
| Outstanding loan @ 06/30/03 31S213 | | 40,000.00 |
| Outstanding loan @ 06/30/03 31S214 | | 60,000.00 |
| Outstanding loan @ 06/30/03 31S215 | | 10,000.00 |
| Outstanding loan @ 06/30/03 31S219 | | 10,000.00 |
| Outstanding loan @ 06/30/03 31S224 | | 100,000.00 |
| Outstanding loan @ 06/30/03 31S228 | | 10,000.00 |
| Outstanding loan @ 06/30/03 31S230 | | 2,000.00 |
| Outstanding loan @ 06/30/03 31S231 | | 50,000.00 |
| Outstanding loan @ 06/30/03 31S601 | | 25,000.00 |
| **Total Loans Outstanding** | $ | 497,000.00 |
| | | |
| **Cash on Hand** | $ | 617,910.51 |
| **Cash on Hand per G/L** | $ | 617,910.51 |
| Difference: | $ | |

File Name: 31S459

Last update: 07/02/03

hsm

03/29/2006 14:55 FAX 617 727 5153        AG DPLAW DIV



## The Commonwealth of Massachusetts
### Division of Personnel Administration
### One Ashburton Place, Boston, MA 02108

MEMORANDUM OF AGREEMENT

As set forth in this Agreement, and pursuant to Chapter 31, Section 2A (o), Acts of 1967, Wallace H. Kountze, Personnel Administrator, State Division of Personnel Administration, agrees to delegate to Francis McGrath, City Manager, City of Worcester, Massachusetts, the authority for administration of specific Civil Service functions for all positions in the Official and Labor Services in the City of Worcester, with the exclusion of those Civil Service positions located within the Worcester School Department.

It is further agreed that:

1. Primary responsibility for administration of the delegated functions will be assigned to the Personnel Department, City of Worcester, under the administration of Eugene R. Gardiner and for as long as Eugene R. Gardiner remains Personnel Director. Transfer of this responsibility to any other department or individual must be approved by the Personnel Administrator, in writing, prior to such transfer taking place.

2. The State Division of Personnel Administration will conduct periodic audit reviews of all Civil Service functions delegated to the City of Worcester, and the results of such audits shall be presented in writing, within two weeks of the audit's completion, to the City Manager of the City of Worcester, and to the Personnel Director. All records, ledgers, and correspondence relating to the delegated Civil Service functions in the City of Worcester shall be made readily available from the State Division of Personnel Administration.

3. The assistance of the Delegation Project Team will be consistently available to the Personnel Director throughout the delegation process, and the State Division of Personnel Administration will provide training and technical assistance to the City of Worcester for each delegated function as required.

4. It will be the responsibility of the Division of Personnel Administration to provide and explain to the Personnel Director any changes in Civil Service Law and rules which may directly affect any of the delegated functions.

5. The State Division of Personnel Administration will be responsible for notifying the Personnel Director on a

03/29/2006 14:53 FAX 617 727 5755        AG HDEAP DIV          ✏️007

- 2 -

timely basis of any changes in internal procedures which
may affect the delegated functions.

6. No additional functions will be delegated or can be assumed
   in any way by the delegated municipality prior to the devel-
   opment of specific procedures for the administration of that
   function, and the written concurrence of both parties to the
   procedures. These procedures will then comprise an attach-
   ment to this Memorandum of Agreement.

7. Changes in approved procedures for the administration of
   delegated functions may not be made without the review and
   approval of both parties.

8. To the extent that problems, ommissions, or commissions occur
   within Worcester's delegated personnel procedures as a partial
   result of any specific failure on the part of the Division, the
   Division will bear its proportional share of responsibility and
   duty to co-defend.

9. The cost of all services, forms, examinations, and materials
   provided directly by the Division of Personnel Administration
   shall be assumed by the Division of Personnel Administration
   unless otherwise agreed to by both parties. All other costs
   involved in the delegation of those functions will be the re-
   sponsibility of the City of Worcester.

10. The City of Worcester will be required to submit periodic
    reports on the municipality's delegation project. This
    report shall contain both narrative and statistical informa-
    tion in a format to be mutually determined.

11. If at any time after this initial agreement either the City of
    Worcester or the Division of Personnel Administration determines
    that delegation of authority should be discontinued, reversion
    of the authority for all delegated functions to the Division
    of Personnel Administration may be effected through 60 days
    written notice by either the City Manager of the City of
    Worcester or the Personnel Administrator.

   The specific functions to be delegated are described and detailed
in Attachments to this Memorandum. As further functions are delegated,
detailed descriptions shall be reviewed by both parties and appended
to this Agreement.

_Francis J. McGrath_
Francis McGrath
City Manager
City of Worcester

_Eugene R. Gardiner_
Eugene R. Gardiner
Personnel Director
City of Worcester

_Wallace H. Kountze_
Wallace H. Kountze
Personnel Administrator

EXH. "C"

June 23, 1973



*The Commonwealth of Massachusetts*

*Division of Civil Service*

*294 Washington Street, Boston 02108*

OFFICE OF THE DIRECTOR

July 31, 1974

Mr. Francis J. McGrath
City Manager
Worcester, Massachusetts  01608

Dear Mr. McGrath:

As you requested in your letter dated July 29, 1974 and as
permitted by Section 2A (o) of Chapter 31 of the General Laws, I hereby
delegate to you as appointing authority the functions of notifying,
interviewing and appointing eligible persons from lists of applicants
established by me for positions as Clerk and Typist, Clerk and Stenographer
and Building Custodian in Worcester municipal departments, other than the
School Department.

This delegation is contingent upon designation as indicated
in your letter of July 29, 1974 of Eugene R. Gardiner, Worcester
Personnel Director, to monitor the performance of these functions.

This delegation is effective the date such lists are received
by Mr. Gardiner, which we anticipate will be within ten days.

As Director of Civil Service, I retain responsibility for
auditing the performance of these functions by Worcester to insure
compliance with Civil Service Law and Rules.

Our intent is eventually to expand the scope of this
delegation to include other positions and the Worcester School
Department.

Very truly yours,

Edward W. Powers
Director of Civil Service

EWP/MLM
CC:      Eugene R. Gardiner
         Civil Service Commission

EXH. "D"