**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| LINDA JENESKI, <br> And Class of Similarly <br> Situated Individuals; <br><br>                Plaintiffs; <br><br> -vs.- <br><br> CITY OF WORCESTER, MASS.; <br> STEPHEN H. WILLAND; DONALD <br> H. ANDERSON; CARLENE BULL; <br> ROBERT J. HENNIGAN, JR.; DAVID <br> M. MOORE; and RUTH N. BRAM- <br> SON, Individually and as Massachusetts <br> Administrator of Human Resources; and <br> As Successor-in-Interest to Her Indi- <br> vidual and Official Predecessors; <br><br>                Defendants. | § § § § § § § § § § § § § § § § § § § | NO. 05-40019-FDS |

**PLAINTIFF'S RULE 59(e) MOTION FOR RECONSIDERATION**

COMES NOW LINDA JENESKI pursuant to FED. R. CIV. P. 59(e) and respectfully asks the Court to reconsider its disposition of this case by dismissal under FED. R. CIV. P. 12(b)(6) on April 6, 2006. For good cause she would show as follows:

I. CASES CITED BY THE COURT

In its oral rendtion, the Court cited three cases upon which it relied. Each deals with the matter of equal protection that is decided on a rational basis test. They are as follows:

*Hoffman v. City of Warwick*, 909 F.2d 608 (1st Cir.1990). "As the Cities argue[d], the state could reasonably have concluded that limiting enhanced seniority to veterans returning to prior employment would serve the legitimate state purpose of enabling the Cities and other employers to engage in effective financial planning."

*Coyne v. City of Somerville*, 972 F.2d 440 (1st Cir.1992).  "Coyne d[id] not allege, for example, that hired candidate A was a childhood friend of defendant B, or that hired candidate C was a political hanger-on of defendant D. He merely avers generally that, 'on information and belief' the jobs went to 'friends, cronies' or other favorites of the school committee.'"  Case dismissed at trial court level for insufficient pleadings.  No rational basis analysis reached by the Court.

*Stern v. Luibel*, 778 F.2d 1052 (5th Cir.1985).  "After a bench trial, the district court found that the Hospital District's different treatment of allopaths and osteopaths was 'not a requirement which has as a foundation a reasonable basis such as professional and ethical qualifications for the common good of the public or the hospital itself,' 565 F.Supp. at 1454 . . . ."  At that bench trial, "[d]efendants [Tarrant County Hospital Dist.] asserted that even if such approval of graduate training programs is differentiation on the basis of academic medical degree, it is not solely on such a basis, but is also based on the reasonable desire on the part of the Board that only the physicians of the highest quality be on the staff."  *Id.*

## II.  ANALYSIS

At the outset, Plaintiff concurs with the court that the disparate classifications involved here need only survive a rational basis analysis.  Nevertheless, Plaintiff contends that *Coyne* is not particularly instructive.  Since the pleadings in that case lacked specificity, the Court never reached the defendant City of Somerville's rationale for its actions.

On the other end of the spectrum, *Stern* is instructive but posturally distinguished because the case went to a full bench trial at which the trial court had the opportunity to consider and then reject the defendant's rational basis justification for its actions.

*Hoffman* is the most instructive.  Posturally, there, as here, the trial court dismissed on 12(b)(6) grounds without advancing to discovery or trial.  Nevertheless, somewhere in the motion-

-3-

to-dismiss-process, the defendant cities of Warwick and East Providence advanced their own argument as to their rational economic basis for not following the state statute. That has not happened here. A thorough review of the City's argument in its *Motion to Dismiss* [Doc.#39] and related *Memorandum* [Doc.#40] reveal that *Hoffman* is not cited nor is any rational basis advanced to explain the City's actions. In fairness to the City, those documents were responsive to the *First Amended Complaint* and the Court acted theoretically on the *Second Amended Complaint.* Consequently, it appears that the Court may have assumed that the City addressed *Hoffman* [City, in fact, did address *Coyne*] where instead, *Hoffman* was introduced by the Court. The net effect of all this is that in its oral rendition, the Court itself may have inadvertently advanced a possible economic rationale for the City of Worcester's behavior that the City itself had not advanced. Respectfully, that is for the litigants to do. "[T]he state must provide a principled justification to explain why some win and some lose, to explain why Group A may tap the state's limited coffers and Group B may not." *Hoffman, citing Bishop v. Moran*, 676 F.Supp. 416, 423 (D.R.I. 1987).

### III. REQUEST FOR MODIFICATION OF JUDGMENT

Thus, the Plaintiff respectfully requests the Court to modify its 12(b)(6) judgment of April 6, 2006 and require the City to provide the rational basis for its actions in light of the following law from *Hoffman*: "Even where the governmental goal is legitimate, the government may not use arbitrary and irrational classifications to achieve its ends." *Hoffman, citing Skylar v. Byrne*, 727 F.2d 633, 640 (7th Cir.1984). Further, Plaintiff requests that the Court require that in applying that law, the defendant City's "principled justification" be ordered to be responsive to its own admissions that are set forth in the *Plaintiff's Second Amended Complaint*, reproduced from that complaint as follows:

    25.    The presumed exemption from civil service protection was a widespread mis-

understanding among the affected employees based on the long standing affirmative misrepresentations and concealments of the City, its Legal Department, and Human Resources Department. Significantly, this situation only began to surface in a letter from the City Manager to the Council on September 28, 2004 which states the following:

> Civil Service Corrective Legislation. This reorganization plan also contains my recommendation for Home Rule Legislation which would acknowledge the historical practice of considering a large number of employees within the Executive Office of the City Manager as *exempt* from Civil Service. These positions include those in the Budget Office, Development Office, Neighborhood Services, Elder Affairs, *Human Resources and Employment and Training*. The City Solicitor advises me that the legal basis for treating these positions as exempt has become more questionable over time and has recommended that the City seek special legislation to place these exemptions on unassailable legal ground.

Michael V. O'Brien, Letter to Council, September 28, 2004, pp. 12-13 (emphasis added).

26. Nothing in the September 28, 2004 submission indicated that it was anything other than the submission of a finalized proposed Plan of Reorganization. Yet, after Ms. Jeneski's appearance at the MCAD on October 20, 2004 at which the "civil service scam" was brought to the attention of the MCAD by successor counsel, the City Manager found it necessary to submit a revision to that Plan on November 16, 2004, ". . . so as to correct typographical errors, and in a few places, make changes of substance" in the following particulars:

> In accordance with the City Solicitor's recommendation, I am submitting this revised edition of the Citywide Reorganization Plan as a separate plan in light of the reorganization plan now pending before the municipal operations committee. Under the City Charter, the City Council must refer this plan to a committee for a public hearing and report back to Council. I recommend a favorable report from the Committee and, upon receipt of that report, a favorable report of the City Council. With the submission of this revised plan, I wish to withdraw my original submission and recommend that the Council simply place that plan on file.
>
> My original submission to Council included requests for authority to file two Home Rule petitions concerning the civil service status of city employees.

> *These requests were not technically part of the reorganization plan and may be deliberated by council without regard to the procedural requirements of the City Charter for Reorganization Plans.* The primary legislation would remove the chiefs and deputy chiefs of the Police and Fire Departments from civil service. The Municipal Operations Committee has expressed a number of concerns with that legislation and I respectfully request this item to remain in Committee for such additional time as may be required for me to respond to the concerns of the Committee.
>
> The second legislative request concerns the civil service status of other, non-public safety, City Departments. *This legislation would acknowledge the historical practice of the City considering a large number of employees within the former Executive Office of the City Manager as exempt from civil service.* The legislation also included Civil Service exemptions for other departments that were not part of this historical practice (Purchasing, City Clerk, Library, Veteran's Services, Auditing & Law. I have revised the proposed legislation to make this distinction clear with Section One addressing the historically exempt offices and Section Two addressing the others. I urge Council to act now to approve the filing of this petition and have attached the revised legislation with a draft form of Council Order which would authorize its filing.

Michael V. O'Brien, Letter to Council, November 16, 2004, pp. 1-2 (emphasis added).

27. But for a front page article in the <u>Worcester Telegram & Gazette</u> on December 8, 2004, headlined, "O'Brien Reorg OK'd," the City's attempt to "fly under the radar of public hearings" its decades long unlawful practices would not have come to the plaintiff's attention nor would this lawsuit have been filed. The T&G article states, in pertinent part, "[a]s part of the reorganization plan, the council also approved an order authorizing the city manager to file legislation to exempt from Civil Service laws positions in the Executive Office of the City Manager and some other departments, which have traditionally been considered exempt from Civil Service."

28. The 2004 Plan proposal, *infra*, also continues to refer to the defunct Job Training and Partnership Act (1988) which supports plaintiff's contentions of ongoing violations of 28 U.S.C. 2832(f)(1)(A). Under the JTPA, what are now "Workforce Central" and the "Regional Employment Board" were lawfully structured as a single entity. However,

under the WIA, the legislation requires separate structures which dis-allow the "W.I.B. Director" from siphoning funds from the statutory "One Stop Provider." This statutory violation, for a period now in excess of seven years, *is prima facie* evidence of some of the conspiratorial "illegal ends" alleged herein under § 1985.

PL. 2ND AM. CPLT., pp. 9-ff (emphasis original)(typeface changed for distinguishment purposes).

Plaintiff also requests that the Court take such other and further measures that are required to bring the record into a posture congruent with *Hoffman* that will thus allow the Plaintiff to conduct an appropriate *Hoffman* analysis of this case.

                                         Respectfully submitted,

                                         DANIEL J. SHEA, P.C.

                                         By:   /s/Daniel J. Shea, ECF
                                                DANIEL J. SHEA
                                                B.B.O.# 652896
                                                1928 West Bell Street
                                                Houston, TX 77019-4814
                                                (713) 942-7500 Telephone
                                                (713) 942-7507 Telecopier
                                                (832) 647-3612 Mobile
                                                djs7500@aol.com

                                         ATTORNEY FOR LINDA JENESKI
                                         AND PUTATIVE CLASS

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on April 7, 2006 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or about April 10, 2006.

                                                /s/ Daniel J. Shea